# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PULTE HOME CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN SAFETY INDEMNITY COMPANY,<br><br>Defendant. | Case No.: 16-cv-02567-H-AGS<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Doc. No. 20.] |

On August 8, 2017, Plaintiff Pulte Home Corporation ("Pulte") filed a motion for partial summary judgment. (Doc. No. 20.) On September 1, 2017, Defendant American Safety Indemnity Company ("ASIC") filed an opposition to Plaintiff's motion. (Doc. No. 21.) On September 11, 2017, Pulte filed a reply. (Doc. No. 22.) That same day, the Court took the matter under submission. (Doc. No. 23.) For the reasons below, the Court denies Pulte's motion.

## Background

The present diversity action is an insurance coverage dispute wherein Pulte asserts that it qualifies as an "additional insured" under several insurance policies issued by ASIC. (Doc. No. 1, Compl. ¶ 8.) In this summary judgment motion, Pulte seeks a declaration that one of ASIC's insurance policies—issued to non-party Concrete Concepts, Inc. ("CCI")—

obligated ASIC to defend Pulte in Salazar, et al. v. Pulte Home Corp., et al., Case No. 37-2013-00079447-CU-CD-CTL ("Salazar"), a settled action formerly pending in the Superior Court of San Diego County.

**I.     Relevant Facts**

Pulte is a residential real estate developer. (Doc. No. 1 at ¶ 9.) Between 2003 and 2005, it served as the general contractor for a real estate development project called "The Reserve at the Woods" in Chula Vista, California.[1] (Ibid.) As part of this project, Pulte subcontracted with CCI to lay concrete foundations for the project's residences. (Doc. No. 20-14, CCI Scope of Work, PageID 1679–83.)

Pulte's agreement with CCI required CCI to maintain general commercial liability insurance ("GCL"), and to obtain an endorsement listing Pulte as an additional beneficiary under CCI's policy. (Doc. No. 20-13, Contractor Base Agreement, PageID 1671–72.) During the pendency of the project, CCI purchased two GCL policies from ASIC covering the period from October 20, 2003 through October 20, 2015. (Doc. No. 21-1, ASIC's Statement of Material Facts, PageID 1999.) Each of these policies contained an endorsement extending coverage to "[t]hose parties required to be named as an Additional Insured in a written contract with the Named Insured entered into prior to the loss or occurrence." (Doc. No. 20-15, ASIC Endorsement, PageID 1686.) The policies also contained a series of standard business risk exclusions limiting the scope of coverage for property damage caused by CCI's concrete work. (Doc. No. 20-26, ASIC Policy, PageID 1895.)

In late 2013, several persons who purchased homes in "The Reserve at the Woods" contacted Plaintiff seeking damages for alleged construction defects at the project. (Doc. No. 21 at PageID 2000–02.) On November 25, 2013, Pulte tendered the dispute to ASIC,

---

[1] The project is also sometimes referred to as "The ColRich Reserves at the Woods in Eastlake" in Plaintiff's subcontractor agreements (Doc. No. 20-14, CCI Scope of Work, PageID 1679), and was referred to as "EastLake Woods" in the Salazar complaint. (Doc. No. 20-11, Salazar 1st Am. Compl. ¶ 1.) For purposes of this motion, the Court assumes, without deciding, that these designations all refer to the same project.

invoking the additional insured endorsements in CCI's GCL policies, and arguing that ASIC had a duty to defend Pulte in the forthcoming lawsuit. (Ibid.) The aggrieved homeowners filed a complaint for damages against Pulte in the San Diego County Superior Court on December 10, 2013. (Doc. No. 20-10, Salazar Compl., PageID 1626–1642.) ASIC denied coverage in a letter dated January 9, 2014, (Doc. No. 21 at PageID 2002), and declined Pulte's request for reconsideration in a letter dated January 22, 2015. (Id. at PageID 2007.) Pulte eventually settled the Salazar lawsuit. (Doc. No. 20-1, MSJ, PageID 1425.)

## II.   Procedural History

On October 14, 2016, Pulte filed the instant lawsuit, seeking, among other things, a declaration that ASIC owed Pulte a duty to defend Pulte in the Salazar lawsuit under CCI's GCL policies. (Doc. No. 1 at ¶¶ 25–29.) ASIC answered the suit on December 16, 2017, (Doc. No. 2, Answer), and the parties proceeded to discovery.

On May 26, 2017, Pulte filed a partial summary judgment motion asking the Court to declare that the Georgia choice of law provisions in ASIC's insurance policies were invalid and unenforceable, and to apply California law to this dispute instead. (Doc. No. 11.) The Court denied this motion on June 28, 2017, and determined that Georgia law should govern the construction of ASIC's policies. (Doc. No. 19.)

Pulte then filed the instant partial summary judgment motion on August 8, 2017. (Doc. No. 20.) The motion argues that under Georgia law, ASIC was obligated to defend Pulte in the Salazar action. (Ibid.) The parties have completed their briefing for this motion, and the matter is ripe for decision.[2]

---

[2] Pulte's unopposed request to take judicial notice of the Salazar complaint, its various amendments, and the Notices of Completion relating to construction at "The Reserve at the Woods" is granted. (Doc. No. 20-2, RJN, PageID 1446–47.) These items include matters of public record and other documents whose authenticity is undisputed. See Fed. R. Evid. 201(b); see also (Doc Nos. 20-10, 20-11, 20-12 & 20-24.) Pulte's request to take judicial notice of the San Diego County Superior Court's summary judgment order in Pulte Home Corporation v. American Safety Indemnity Company, No. 37-2013-00050682-CU-IC-CTL, a related case, is denied. Federal courts "may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the

3
16-cv-02567-H-AGS

**Discussion**

I. **Legal Standards for Summary Judgment**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fortune Dynamic, 618 F.3d at 1031 (internal quotation marks and citations omitted); accord Anderson, 477 U.S. at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case that the nonmoving party bears the burden of proving at trial. Id. at 322–23; Jones v. Williams, 791 F.3d 1023, 1030 (9th Cir. 2015). Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e));

---

matters at issue." United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992). The Superior Court's adjudication of the parties' rights under insurance policies not at issue in this litigation has no direct bearing on any issue before the Court. Finally, Pulte's request to take judicial notice of the complaint filed in this case, as well as its attached exhibits, is also denied as moot. The Court does not require judicial notice to take cognizance of the complaint.

4

16-cv-02567-H-AGS

accord Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings."). Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." Anderson, 477 U.S. at 256. "[C]ontract interpretation issues" are "pure legal questions well-suited to summary judgment." Flintkote Co. v. Aviva PLC, 177 F. Supp. 3d 1165, 1172 (N.D. Cal. 2016) (citing Shannon–Vail Five Inc. v. Bunch, 270 F.3d 1207, 1210 (9th Cir. 2001), and TH&T Int'l Corp. v. Elgin Indus., Inc., 216 F.3d 1084 (9th Cir. 2000)).

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make credibility determinations. See Anderson, 477 U.S. at 255. "The evidence of the non-movant is to be believed." Id. Further, the Court may consider other materials in the record not cited to by the parties, but it is not required to do so. See Fed. R. Civ. P. 56(c)(3); Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).

**II.  Analysis**

Pulte moves for summary judgment as to its first cause of action, and seeks a declaration that ASIC's policies with CCI obligated ASIC to defend Pulte in the Salazar lawsuit. ASIC counters by arguing that: (i) Pulte has failed to meet its burden to show that it is an "additional insured" under CCI's GCL policies; (ii) the policies provide coverage only for "ongoing operations," and since "The Reserve at the Woods" was completed in 2005 and is no longer "ongoing," any coverage duties have expired; (iii) the Salazar lawsuit was not an "occurrence" triggering coverage under the policies; and (iv) the policies' business risk exclusions unambiguously bar coverage for the claims alleged in the Salazar lawsuit. As explained below, the Court agrees that the policies' business risk exclusions bar coverage, and accordingly declines to address the parties'

remaining issues. The Court thus assumes, without deciding, that Pulte is an "additional insured" under CCI's policies.

A. Law Governing the Duty to Defend.

The Court previously determined that Georgia law governs the construction of CCI's GCL policies. (Doc. No. 19.) The Ninth Circuit has recently explained that:

> "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." Gee v. Tenneco, Inc., 615 F.2d 857, 861 (9th Cir. 1980); accord U.S. Fidelity and Guaranty Co. v. Lee Investments LLC, 641 F.3d 1126, 1133 (9th Cir. 2011) ("Perhaps a better way of putting it is to say that one of the goals in deciding state law questions is to do no harm to state jurisprudence."). "[F]ederal courts are bound by the pronouncements of the state's highest court on applicable state law." Ticknor v. Choice Hotels, Inc., 265 F.3d 931, 939 (9th Cir. 2001). Similarly, a federal court is "not free to reject a state judicial rule of law merely because it has not received the sanction of the state's highest court, but it must ascertain from all available data what the state law is and apply it." Estrella v. Brandt, 682 F.2d 814, 817 (9th Cir. 1982). "An intermediate state appellate court decision is a 'datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" Id. at 817 (quoting West v. A.T.&T. Co., 311 U.S. 223, 237 (1940)); see also Lewis v. Tel. Empl. Credit Union, 87 F.3d 1537, 1546 (9th Cir. 1996) (citing In re Kirkland, 915 F.2d 1236, 1239 (9th Cir. 1990) to recognize that ". . . where there is no convincing evidence that the state supreme court would decide differently, 'a federal court is obligated to follow the decisions of the state's intermediate appellate courts'").

Kwan v. SanMedica Int'l, 854 F.3d 1088, 1093 (9th Cir. 2017).

Under Georgia law, "in construing the terms of an insurance policy," the Court must "look first to the text of the policy itself." Ga. Farm Bureau Mut. Ins. Co. v. Smith, 784 S.E.2d 422, 424 (Ga. 2016). "Words in the policy are given their 'usual and common' meaning, see OCGA § 13–2–2(2), and the policy 'should be read as a layman would read it and not as it might be analyzed by an insurance expert or attorney.'" Id. (quoting State Farm Mut. Auto. Ins. Co. v. Staton, 685 S.E.2d 263, 265 (Ga. 2009)). "Where the contractual language is explicit and unambiguous, 'the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured.'" Id. (quoting Reed v. Auto–Owners Ins. Co., 667 S.E.2d 90, 92 (Ga. 2008)). "This is so because Georgia law permits an insurance company to 'fix the terms of its policies as it sees fit, so long as they are not contrary to the law,' thus companies are free

to 'insure against certain risks while excluding others.'" Id. (quoting Payne v. Twiggs Cty. Sch. Dist., 496 S.E.2d 690, 691 (Ga. 1998)).

In Georgia, as in most states, an insurer's duty to defend is quite broad. In ascertaining "whether an insurer has a duty to defend[,]" the Court must compare "the language of the policy . . . with the allegations of the complaint" asserted against the insured. Hoover v. Maxum Indem. Co., 730 S.E.2d 413, 418 (Ga. 2012). "If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." Id. (quoting BBL-McCarthy, LLC v. Baldwin Paving Co., 646 S.E.2d 682, 685 (Ga. Ct. App. 2007)). This maxim holds even if "the allegations of the complaint against the insured are ambiguous or incomplete with respect to the issue of insurance coverage." Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc., 490 S.E.2d 374, 376 (Ga. 1997). However, the duty to defend will not arise if the facts alleged in the complaint "unambiguously exclude coverage under the policy[.]" Ibid. (citation and internal quotation marks omitted).

B.  Relevant Policy Language.

CCI's GCL policies provide that ASIC has "the duty to defend the insured against any suit seeking . . . damages" for "property damage."[3] (Doc No. 20-26 at PageID 1892.) However, the policies also provide that "[t]his insurance does not apply to . . . 'Property damage' to: . . . **(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations; or **(6)** That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (Id. at PageID 1892, 1895.) Provisions like these are known as "business risk exclusions," and "are designed to exclude coverage for defective workmanship by the

---

[3] "Property damage" is defined as either: (a) "Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;" or (b) "Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." (Doc. No. 20-26 at PageID 1904.)

7

16-cv-02567-H-AGS

insured builder causing damage to the construction project itself." Auto Owners Ins. Co. v. Gay Constr. Co., 774 S.E.2d 798, 800 (Ga. Ct. App. 2015) (emphasis, citation and internal quotation marks omitted); see also Taylor Morrison Servs., Inc. v. HDI-Gerling Am. Ins. Co., 746 S.E.2d 587, 592 (Ga. 2013) ("'[B]usiness risk' exclusions of a CGL policy . . . may serve to exclude liabilities for the repair or correction of defective work from the scope of coverage."). As the Georgia Court of Appeals has explained in a case dealing with almost identical exclusions:

> There are two kinds of risks that are incurred by a contractor. The first is the business risk borne by the contractor to replace or repair defective work to make the building project conform to the agreed contractual requirements. This type of risk is not covered by the [CGL] policy, and the business risk exclusions in the policy make this clear. The second is the risk that the defective or faulty workmanship will cause injury to people or damage to other property. Because of the potentially limitless liability associated with this risk, it is the type for which . . . commercial general liability coverage is contemplated . . . . The risk intended to be insured is the possibility that the . . . work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the . . . completed work itself, and for which the insured may be found liable.

SawHorse, Inc. v. S. Guar. Ins. Co. of Ga., 604 S.E.2d 541, 544 (Ga. Ct. App. 2004) (footnote omitted, ellipses in original) (quoting Sapp v. State Farm Fire & Cas. Co., 486 S.E.2d 71, 74–75 (Ga. Ct. App. 1997)).

C.    Relevant Language in the *Salazar* Complaint.

Pulte identifies two paragraphs in the Salazar complaint that allegedly triggered ASIC's duty to defend. First, the Salazar plaintiffs alleged at ¶ 12 of the complaint that:

> Defendants, and each of them, were involved in the business of designing, developing, building, constructing, repairing, maintaining, installing, manufacturing, supplying and/or selling the subject Real Property which was done in an improper fashion resulting in said Real Property suffering substantial damage as a direct and proximate consequence including, but not limited to: plumbing leaks; roof leaks; window leaks; ceiling stains; difficult operation of windows and doors; **concrete hardscape issues, including efflorescence and cracking** (hereinafter collectively referred to as the "Defective Conditions").

(Doc. No. 20-11 at ¶ 12 (emphasis added).) Second, the Salazar plaintiffs largely repeated this language at ¶ 45:

> Said structures and Real Property are not of merchantable quality, were not constructed, developed, designed, manufactured, built, located, and/or improved in a workmanlike manner, and are not fit for the purpose of being

8

> used as single family residences, but instead, are defective, as is now known, in that the structures and Real Property have plumbing leaks; roof leaks; window leaks; **concrete hardscape issues, including efflorescence and cracking**; and shower leaks.

(Id. at ¶ 45 (emphasis added).)

Pulte argues that these references to concrete "efflorescence and cracking" put ASIC on notice that property damage caused by CCI's concrete work would be at issue in the Salazar action, triggering ASIC's duty to defend under the GCL policies.

D. Application of Georgia Law to the Facts.

The Court's task is to determine whether the Salazar complaint arguably alleged property damage caused by CCI's concrete work that was not affirmatively excluded from coverage by the GCL policies' business risk exclusions. Ga. Farm Bureau, 784 S.E.2d at 424. Applying Georgia law, the Court concludes that the facts alleged in the Salazar complaint were insufficient to trigger ASIC's duty to defend.

The Salazar complaint contained only two vague references to property damage stemming from defects even arguably within the scope of CCI's concrete work. Specifically, the complaint alleged property damage resulting "concrete hardscape issues, including efflorescence and cracking." (Doc. No. 20-11 at ¶¶ 12, 45.) Even charitably assuming that these "concrete hardscape issues" encompassed CCI's foundation work, the complaint did not allege or imply that these concrete defects had caused damage to persons or property unrelated to the concrete itself. This is critical because ASIC only agreed to insure "the risk that [CCI's] defective or faulty workmanship [would] cause injury to people or damage to other property" outside of CCI's scope of work. Auto Owners, 774 S.E.2d at 801 (citation and internal quotation marks omitted). The policies' j(5) and j(6) business risk exclusions exempt from coverage property damage that "arises out of" CCI's subcontracting "operations" on Pulte's behalf, and any costs associated with "any property that must be restored, repaired or replaced because" of CCI's defective work. (Doc. No. 20-26 at PageID 1895.) "Efflorescence and cracking" are run-of-the-mill construction defects, and any property damage associated with these problems would indisputably arise

out of CCI's operations. Moreover, the other type of foreseeable damages associated with such defects—the costs associated with repairing or replacing the damaged foundations—is also clearly excluded from coverage under the policies. Accordingly, because the complaint did not even arguably implicate damages not covered by the j(5) and j(6) exclusions, ASIC had no duty to defend Pulte in the Salazar action.

In reaching this conclusion, the Court is strongly guided by the Georgia Court of Appeals' recent decision in Auto Owners Insurance Co. v. Gay Construction Co. There, the plaintiff contractor, GCC, employed two subcontractors to pour a concrete floor under a newly constructed park terrace, and to install a waterproof membrane under the floor to prevent moisture from leaking from the terrace into restrooms located on the floor below. 774 S.E.2d at 799. The waterproof membrane proved defective, and GCC submitted a claim for costs associated with repairing the defective work to the subcontractors' insurer, Auto Owners. Ibid. Auto Owners denied coverage, citing three business risk exclusions in the subcontractors' GCL policies materially similar to the j(5) and j(6) exclusions in ASIC's policies. Ibid. Of particular relevance here, the Auto Owners policies excluded coverage for: (i) "property damage to [the subcontractor's] work arising out of it or any part of it;" and (ii) "property damage to impaired property or property that has not been physically injured arising out of . . . a defect, deficiency, inadequacy, or dangerous condition in" the subcontractors' work. Ibid. (brackets and internal quotation marks omitted).

In evaluating whether Auto Owners was justified in denying coverage, the Court of Appeals reasoned that when an insurance contract contains broadly worded business risk exclusions, the court must ask "itself, 'Will the payment of insurance proceeds effectively cause an insurance company to guarantee the contractor's work?' If the answer is yes, the business-risk exclusions apply and the claim is denied." Id. at 800 (quoting Transp. Ins. Co. v. Piedmont Constr. Grp., LLC, 686 S.E.2d 824, 827 (Ga. Ct. App. 2009)). The court held that because "there was no claim for damage to nondefective property not covered by GCC's or [the subcontractor's] scope of work," coverage was "barred by the business risk

exclusions in the Auto-Owners policy." Ibid. (footnote omitted). The court further held that the business risk exclusions applied equally to GCC as an additional insured under the policy, reasoning that any other rule "would permit GCC more coverage as an additional insured than that granted to [the subsidiary] as a policy-holder and would effectively require Auto Owners to financially guarantee [the subsidiary's] work." Id. at 801.

The Court recognizes that Auto Owners involved the insurer's duty to indemnify, rather than the broader duty to defend. The Court nevertheless finds Auto Owners controlling on these facts.[4] Auto Owners confirmed that when an insurance policy contains business risk exemptions like those present in ASIC's policies, there is no coverage unless there is a "claim for damage to nondefective property not covered by [the general contractor's] or [the subcontractor's] scope of work." Id. at 800 (footnote omitted). As the Court has explained, nothing in the Salazar complaint hinted at property damage beyond that arising out of or necessary to remediate CCI's defective work. Permitting coverage on these facts would "effectively cause [ASIC] to guarantee [CCI's] work," and therefore "the business-risk exclusions apply and the claim is denied." Ibid. (quoting Transp. Ins. Co., 686 S.E.2d at 827); see also Penn-Am. Ins. Co., 490 S.E.2d at 376 (holding that "the insurer need not provide a defense" where "the complaint sets forth true factual allegations showing no coverage").

Pulte does not contest the applicability of Auto Owners to this case, but rather argues that it was wrongly decided. Specifically, Pulte argues that Auto Owners impermissibly construed the business risk exclusions in that case as applying not just to named insured (the subcontractor responsible for the defective waterproof membrane), but also to the additional insured party (the general contractor). Pulte argues that this construction not only violated the terms of the insurance policies in that case, but also contradicted the

---

[4] The Court also recognizes that Auto Owners was not a decision from the Georgia Supreme Court. "However, where there is no convincing evidence that the state supreme court would decide differently, 'a federal court is obligated to follow the decisions of the state's intermediate appellate courts.'" Lewis, 87 F.3d at 1545 (quoting Kirkland, 915 F.2d at 1239). Pulte has cited no convincing evidence that the Georgia Supreme Court would disapprove Auto Owners.

11

general maxim that "[e]xceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." Alley v. Great Am. Ins. Co., 287 S.E.2d 613, 616 (Ga. Ct. App. 1981) (quoting Krug v. Millers' Mut. Ins. Etc., 495 P.2d 949 (Kan. 1972)). Instead, Pulte argues that the Court should follow the Georgia Court of Appeals' decision in Transportation Insurance Company v. Piedmont Construction Group, LLC., where the court held that the insurer owed a duty to defend a contractor in spite of the same j(5) and j(6) exclusions present in ASIC's policies. 686 S.E.2d at 826.

The Court is not persuaded. It was entirely reasonable for the Georgia Court of Appeals to interpret the Auto Owners policies to grant the same coverage to both the named insured as well as any additional insured parties. More importantly, Pulte has not pointed to any decisions of the Georgia Supreme Court that contradict Auto Owners' reasoning. In the absence of any compelling reason to do so, the Court declines to second-guess the Georgia Court of Appeals' interpretation of Georgia insurance law.

Moreover, Transportation Insurance Company is distinguishable. In that case, "a plumbing subcontractor soldering copper pipes" while renovating a historic building "accidentally ignited a wooden wall stud, starting a fire which completely destroyed the roof and entire second floor of the building and caused extensive damage to the rest of the structure." Ibid. The Court of Appeals held that the j(5) and j(6) exclusions did not excuse the insurer's duty to defend because it was patently obvious that the fire caused by the subcontractor's negligence caused property damage beyond the scope of the subcontractor's plumbing work. Id. at 828 ("This case is not limited to damages to 'that particular part of real property' on which the plumbing subcontractor was working when it accidentally started a devastating fire. It involves damages to the entire building, including portions as to which [the general contractor] had not originally contracted to perform any work."). Here, by contrast, there are no allegations that CCI's allegedly defective concrete work caused any damage to unrelated property at "The Reserve at the Woods."

Finally, the Court also recognizes that the California Court of Appeal recently held that other lawsuits stemming from construction defects at Pulte-constructed properties triggered ASIC's duty to defend Pulte in spite of identical business risk exclusions to those present here. Pulte Home Corp. v. Am. Safety Indem. Co., No. D070478, --- Cal. App. 4th ---, 2017 WL 3725045, at *16–17 (Aug. 30, 2017) (published). However, the Court's decision is not in tension with the Court of Appeal's holding for two reasons. First, the Court of Appeal applied California law to the agreements at issue in that case, and thus was not bound by the reasoning in Auto Owners. Second, the underlying complaints at issue in the Court of Appeal's decision appear to have contained much more detailed allegations against Pulte, and more clearly created the potential for coverage. See id. at *17 ("As far as the construction defect complaints disclose, there were potentially overlapping forms of damage among the different locations of concrete, electrical and other types of work, all of which had permitted some kind of moisture damage to occur over time. It was factually unclear under exclusion j. (5) that no coverage was possible for property damage located at the site of each named insured's operations, or if the alleged damage arose solely out of those particular operations."). The Court of Appeal's decision is thus distinguishable on both the law it applied and its facts.

## Conclusion

For the foregoing reasons, the Court concludes that ASIC's insurance policies unambiguously excluded coverage for the construction defects referenced in the Salazar complaint. Pulte is thus not entitled to judgment as a matter of law on its first cause of action. The Court accordingly denies Pulte's motion for partial summary judgment.

**IT IS SO ORDERED.**

DATED: September 13, 2017

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT