# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PULTE HOME CORPORATION,<br><br>          Plaintiff,<br><br>v.<br><br>TIG INSURANCE COMPANY,<br><br>          Defendant. | Case No.: 3:16-cv-02567-H-AGS<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT; and**<br><br>[Doc. Nos. 37, 38.]<br><br>**(2) GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 42.] |

On February 8 and February 27, 2018, Plaintiff Pulte Home Corporation ("Pulte") filed two motions for partial summary judgment. (Doc. Nos. 37, 38.) On March 5, 2018, Defendant TIG Insurance Company ("TIG"), the successor by merger to the American Safety Indemnity Company ("ASIC"), filed its own cross-motion for summary judgment. (Doc. No. 42.) The parties filed their respective opposition papers on April 2, 2018, (Doc. Nos. 48, 49, 50), and their reply briefs on April 9, 2018. (Doc. Nos. 52, 53, 54.) The Court held a hearing on the motions on April 16, 2018. Robert C. Carlson and Sharon Ann Huerta appeared for Pulte, while Robert Wayne Keaster appeared for TIG. For the reasons below, the Court denies Pulte's motions, and grants summary judgment to TIG.

This diversity action presents an insurance coverage dispute wherein Pulte asserts that it qualifies as an "additional insured" under several insurance policies issued by ASIC, and that TIG is now responsible for by merger. (Doc. No. 1, Compl. ¶ 8.) In its third partial summary judgment motion, Pulte asks the Court to bar TIG from re-litigating certain issues decided by the California Court of Appeal under California law in a related state court lawsuit between the parties. (Doc. No. 37.) See Pulte Home Corp. v. Am. Safety Indem. Co., 14 Cal. App. 5th 1086 (2017) ("Pulte I"). In its fourth partial summary judgment motion, Pulte seeks a declaration that one of ASIC's insurance policies—issued to non-party Tunstill Plastering, Inc. ("Tunstill")—obligated ASIC to defend Pulte in Morris, et al. v. Pulte Home Corporation, et al., Case No. RIC1211981 ("Morris"), a settled action formerly pending in the San Diego County Superior Court. (Doc. No. 38.) TIG, by contrast, argues that the relevant insurance policies affirmatively exclude coverage for Pulte's claims, and seeks summary judgment against each of Pulte's causes of action. (Doc. No. 42-27.)

## I. Relevant Facts

Pulte is a residential real estate developer. (Doc. No. 1 at ¶ 9.) Between 2003 and 2007, it served as the general contractor for two real estate development projects relevant to this lawsuit: (i) "The Reserve at the Woods" in Chula Vista, California, (id.); and (ii) "The Meadows" in Temecula, California. (Id. at ¶ 10). Pulte hired numerous subcontractors to work on these projects, including non-parties Concrete Concepts, Inc. ("CCI"), Foshay Electric Co., Inc. ("Foshay"), MJW & Associates, Inc. ("MJW"), and Tunstill (collectively, "Pulte's subcontractors" or "the subcontractors"). (Id. at ¶ 19.)

Pulte required its subcontractors to maintain general commercial liability ("GCL") insurance, and to obtain additional insured endorsements ("AIEs") listing Pulte as an added beneficiary under the subcontractors' GCL policies. (Id. at ¶ 18.) The GCL policies provided that ASIC had a duty to defend insured parties against any lawsuit seeking

damages for property damage.[1] (See, e.g., Doc No. 20–26, CCI Policy, PageID 1892.) Each of the AIEs contained language extending coverage to Pulte, but "only" as to "ongoing" operations performed by the subcontractors for Pulte "on or after the effective date of" the AIEs. (See Doc. No. 42-2, CCI Policy Dated 10/20/2004, PageID 4400; Doc. No. 42-3, Foshay Policy Dated 7/3/2003, PageID 4471; Doc. No. 42-4, Foshay Policy Dated 7/3/2004, PageID 4531; Doc. No. 42-5, MJW Policy Dated 1/22/2006, PageID 4599; Doc. No. 42-6, MJW Policy Dated 1/22/2007, PageID 4665; Doc. No. 42-7, Tunstill Policy Dated 3/25/2006, PageID 4735; Doc. No. 42-8, Tunstill Policy Dated 3/25/2007, PageID 4800.)

In 2012 and 2013, several persons who purchased homes in "The Reserve at the Woods" and "The Meadows" contacted Pulte seeking damages for alleged construction defects. (See Doc. No. 20-3, Pulte Statement of Facts, at ¶ 3; Doc. No. 38-27, Pulte Statement of Facts, at ¶ 2.) Homeowners at "The Meadows" filed the Morris lawsuit against Pulte on August 7, 2012, (Doc. No. 38-27 at ¶ 2), and homeowners at "The Reserve at the Woods" filed a separate lawsuit, Salazar, et al. v. Pulte Home Corp., et al., Case No. 37–2013–00079447–CU–CD–CTL ("Salazar"), against Pulte in the San Diego County Superior Court on December 10, 2013. (Doc. No. 20-3 at ¶ 4.) Pulte tendered both lawsuits to ASIC seeking a defense, but ASIC denied coverage in letters dated January 11, 2013 and January 9, 2014, respectively. (Doc. No. 20-3 at ¶¶ 12–13; Doc. No. 38-27 at ¶¶ 12–13.) Pulte subsequently settled both actions.

## II. Procedural History

On October 14, 2016, Pulte filed the instant lawsuit, seeking: (i) declarations that ASIC had a duty to defend Pulte in the Salazar and Morris actions under the AIEs for ASIC's policies with CCI, Foshay, MJW, and Tunstill, (Doc. No. 1 at ¶¶ 25–44);

---

[1] The policies defined "property damage" as either: (a) "Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;" or (b) "Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." (Doc. No. 20–26 at PageID 1904.)

(ii) breach of contract damages stemming from ASIC refusal to tender a defense in <u>Salazar</u> and <u>Morris,</u> (id. at ¶¶ 45–50); and (iii) damages for breach of the implied covenant of good faith and fair dealing. (<u>Id.</u> ¶¶ 51–60.) ASIC answered the suit on December 16, 2017, (Doc. No. 2, Answer), and the parties proceeded to discovery.

On May 26, 2017, Pulte filed a partial summary judgment motion asking the Court to declare that the Georgia choice of law provisions in ASIC's insurance policies were invalid and unenforceable, and to apply California law to this dispute instead. (Doc. No. 11.) The Court denied this motion on June 28, 2017, and determined that Georgia law should govern the construction of ASIC's policies. (Doc. No. 19.) <u>Pulte Home Corp. v. Am. Safety Indem. Co.</u>, 268 F. Supp. 3d 1091, 1099 (S.D. Cal. 2017) (<u>Pulte II</u>).

Pulte then filed a second partial summary judgment motion on August 8, 2017, seeking a declaration that ASIC owed Pulte a duty to defend the <u>Salazar</u> lawsuit pursuant to CCI's GCL policy. (Doc. No. 20.) The Court denied the motion on September 13, 2017, concluding that the j(5) and j(6) business risk exclusions in ASIC's policies with CCI unambiguously excluded coverage for the construction defects referenced in the <u>Salazar</u> complaint. (Doc. No. 25) <u>Pulte Home Corp. v. Am. Safety Indem. Co.</u>, 264 F. Supp. 3d 1073, 1082–83 (S.D. Cal. 2017) (<u>Pulte III</u>). The Court denied reconsideration on October 17, 2017. (Doc. No. 33.)

While this federal lawsuit was pending, the parties litigated substantially similar claims in the San Diego County Superior Court stemming from ASIC's refusal to tender a defense in two other lawsuits alleging construction defects at Pulte-built properties in Southern California. On August 30, 2017, the California Court of Appeal rejected ASIC's various coverage defenses under California law, and held that ASIC had a duty to defend Pulte under GCL policies and AIEs substantially similar to those at issue in this suit. <u>Pulte I</u>, 14 Cal. App. 5th 1086 (2017). The California Supreme Court denied review on

November 15, 2017.[2]

On February 8, 2018, Pulte filed a third partial summary judgment motion, which argues that the California Court of Appeal's judgment in <u>Pulte I</u> should be given preclusive effect under the doctrine of collateral estoppel, and control most of the contract interpretation issues in this suit. (Doc. No. 37.) On February 27, 2018, Pulte filed a fourth partial summary judgment motion seeking a declaration that ASIC owed Pulte a duty to defend the <u>Morris</u> action under ASIC's policy with Tunstill. (Doc. No. 38.) On March 5, 2018, TIG filed a cross-motion for summary judgment as to each of Pulte's causes of action, arguing that coverage for the <u>Salazar</u> and <u>Morris</u> lawsuits was unambiguously excluded under various provisions in the GCL policies and AIEs. (Doc. No. 42.) The parties have completed their briefing, and the matter is ripe for disposition.[3]

**Discussion**

## I.     Legal Standards for Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.</u>, 618 F.3d 1025, 1031 (9th Cir. 2010).  "A genuine issue of material fact exists when the evidence is

---

[2]     Under California law, a judgment does not become "final" for res judicata or collateral estoppel purposes until after all appeals have been resolved or the California Supreme Court denies review.  <u>See</u> <u>Sosa v. DIRECTV, Inc.</u>, 437 F.3d 923, 928 (9th Cir. 2006).

[3]     The parties have filed numerous requests for judicial notice, (Doc. Nos. 38-2, 49-2, 50-2), each seeking to admit litigation documents filed in the <u>Salazar</u> or <u>Morris</u> actions, or else notices of completion related to Pulte's residential construction projects.  The Court grants the requests.  Federal courts "may take judicial notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue."  <u>United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.</u>, 971 F.2d 244, 248 (9th Cir. 1992).  The <u>Salazar</u> and <u>Morris</u> litigation documents clearly have a direct relationship with the matters at issue here, because it is those documents that allegedly triggered ASIC's duty to defend.  Moreover, the notices of completion are noticeable as documents whose authenticity is undisputed.  <u>See</u> Fed. R. Evid. 201(b)(2).

3:16-cv-02567-H-AGS

such that a reasonable jury could return a verdict for the nonmoving party." <u>Fortune Dynamic</u>, 618 F.3d at 1031 (internal quotation marks and citations omitted); <u>accord Anderson</u>, 477 U.S. at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case that the nonmoving party bears the burden of proving at trial. <u>Id.</u> at 322–23; <u>Jones v. Williams</u>, 791 F.3d 1023, 1030 (9th Cir. 2015). Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" <u>T.W. Elec. Serv.</u>, 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); <u>accord Horphag Research Ltd. v. Garcia</u>, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." <u>Anderson</u>, 477 U.S. at 256; <u>see also Behrens v. Pelletier</u>, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings."). Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." <u>Anderson</u>, 477 U.S. at 256. "[C]ontract interpretation issues" are "pure legal questions well-suited to summary judgment." <u>Flintkote Co. v. Aviva PLC</u>, 177 F. Supp. 3d 1165, 1172 (N.D. Cal. 2016) (citing <u>Shannon–Vail Five Inc. v. Bunch</u>, 270 F.3d 1207, 1210 (9th Cir. 2001), and <u>TH&T Int'l Corp. v. Elgin Indus., Inc.</u>, 216 F.3d 1084 (9th Cir. 2000)).

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make

credibility determinations. <u>See</u> <u>Anderson</u>, 477 U.S. at 255. "The evidence of the non-movant is to be believed." <u>Id.</u> Further, the Court may consider other materials in the record not cited to by the parties, but it is not required to do so. <u>See</u> Fed. R. Civ. P. 56(c)(3); <u>Simmons v. Navajo Cnty.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).

## II. Analysis

The parties raise a number of issues in their respective summary judgment motions. TIG argues that: (i) Pulte's claims stem from the subcontractors' completed, rather than ongoing operations, and are thus precluded by limiting language in the policies' AIEs; (ii) the <u>Salazar</u> and <u>Morris</u> lawsuits did not allege that the subcontractors caused any damage to property unrelated to their construction work, and thus coverage was precluded under the policies' business risk exclusions; (iii) the <u>Salazar</u> and <u>Morris</u> lawsuits were not "occurrences" as the policies define that term, and thus did not trigger ASIC's duty to defend; (iv) the liability asserted in the <u>Salazar</u> and <u>Morris</u> lawsuits did not arise out of any subcontractor's sole negligence, as required by the policies; (v) ASIC's coverage position was objectively reasonable, and therefore there could not have been any violation of the covenant of good faith and fair dealing; (vi) Foshay's policy did not require Pulte to be added as an additional insured, and thus Pulte cannot prevail on its second cause of action; and (vii) Pulte failed to properly elect coverage with respect to the <u>Morris</u> lawsuit by failing to forward ASIC a copy of the <u>Morris</u> complaint. (Doc. Nos. 42-27, 49.)

By contrast, Pulte argues that each of the coverage defenses offered by TIG were either: (i) already adjudicated by the California Court of Appeal, and thus TIG is collaterally estopped from re-litigating them here; (ii) not relied upon by ASIC in issuing its coverage denial, and thus forfeited; or else (iii) wrong on the merits. (Doc. Nos. 37, 38, 50.) The crux of Pulte's argument is that the duty to defend is exceedingly broad, the <u>Salazar</u> and <u>Morris</u> actions alleged liability that at least arguably fell within the scope of Pulte's coverage, and the policy exclusions TIG relies upon are too ambiguous to support TIG's coverage position. (<u>Id.</u>)

As explained below, the Court agrees with TIG that: (i) its coverage defenses

stemming from Georgia law are not barred by the California Court of Appeal's rejection of those defenses under California law; (ii) the policies' AIEs expressly restrict Pulte's coverage to claims stemming from the subcontractors' ongoing operations; and (iii) the claims alleged in the <u>Salazar</u> and <u>Morris</u> suits did not arise from the subcontractors' ongoing operations. As the Court's resolution of these issues is dispositive as to each of Pulte's causes of action, the Court declines to address the parties' remaining issues.

## A. Collateral Estoppel

Pulte's third partial summary judgment motion argues that most of the issues raised in this lawsuit were already decided by the California Court of Appeal in <u>Pulte I</u>, 14 Cal. App. 5th 1086 (2017), and that the Court of Appeal's resolution of those issues is entitled to preclusive effect. (Doc. No. 37.) Pulte thus argues that TIG should be collaterally estopped from arguing that: (i) the policies limit coverage to claims stemming from the subcontractors' ongoing operations; (ii) the policies' business risk exclusions and "sole negligence" limitation bar coverage for the type of claims asserted in the <u>Salazar</u> and <u>Morris</u> actions; and (iii) ASIC's coverage denial was undertaken in bad faith. <u>See Pulte I</u>, 14 Cal. App. 5th at 1114–24 (rejecting ASIC's coverage defenses under California law). TIG argues that the California Court of Appeal's decision rejecting ASIC's coverage defenses under California law cannot preclude TIG from arguing that those defenses are valid under Georgia law, which governs the policies at issue in this case. <u>Pulte II</u>, 268 F. Supp. 3d at 1099. (Doc. No. 48.) The Court agrees with TIG.

Federal courts sitting in diversity must apply the forum state's law in determining the preclusive effect of a prior judgment. <u>See, e.g.</u>, <u>Jacobs v. CBS Broadcasting, Inc.</u>, 291 F.3d 1173, 1177 (9th Cir. 2002) (collecting cases); <u>Pardo v. Olson & Sons, Inc.</u>, 40 F.3d 1063, 1066 (9th Cir. 1994) ("Because this is a diversity case, we apply the collateral estoppel rules of the forum state . . . ."); <u>Priest v. Am. Smelting & Ref. Co.</u>, 409 F.2d 1229, 1231 (9th Cir. 1969) ("Since federal jurisdiction in this case is based upon diversity of citizenship, the district court and this court must apply the substantive law of the forum state, . . . includ[ing] the law pertaining to collateral estoppel."). The Court's task is thus

to determine whether California courts would treat the California Court of Appeal's judgment in Pulte I as precluding the arguments TIG raises in this lawsuit. Cook v. Harding, 879 F.3d 1035, 1041 (9th Cir. 2018) ("We must give the same preclusive effect to the California Court of Appeal's judgment as California courts would.").[4]

Pulte claims that the California Court of Appeal's Pulte I decision is decisive under the doctrine of collateral estoppel (also known as issue preclusion). "Issue preclusion 'bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.'" ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund, 754 F.3d 754, 760 (9th Cir. 2014) (quoting Taylor v. Sturgell, 553 U.S. 880, 892 (2008)). California's test for issue preclusion has five threshold requirements:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

Cook, 879 F.3d at 1041–42 (quoting ReadyLink, 754 F.3d at 760–61).

TIG argues that the issues to be decided in this lawsuit are not identical to the issues decided in Pulte I because Pulte I was decided under California law, while the policies at issue here are governed by Georgia law. The Court agrees. California courts have held that two lawsuits do not raise identical issues if the suits were decided under the laws of different states, particularly if the second suit raises novel or unsettled legal issues under

---

4    Pulte argues that Georgia law should determine Pulte I's preclusive effect. (Doc. No. 52 at 1–2.) However, because this Court must apply the collateral estoppel rules of its forum state, California law governs Pulte I's preclusive effect. Jacobs, 291 F.3d at 1177. The Court also notes that this result is compelled by the Constitution's Full Faith and Credit Clause, U.S. Const. art. IV, § 1, and its implementing legislation, 28 U.S.C. § 1738, which together require federal courts to "give to a state-court judgment the same preclusive effective as would be given that judgment under the law of the state in which the judgment was rendered"—here, California. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984).

the state law governing that action.  See Diocese of San Joaquin v. Gunner, 246 Cal. App. 4th 254, 267 (2016) (declining to give preclusive effect to Illinois judgment decided under Illinois law where suit before the court was governed by California law); Am. Continental Ins. Co. v. Am. Cas. Co., 86 Cal. App. 4th 929, 945 (2001) ("ACIC's argument [for collateral estoppel] fails because it has not established that the 'same issue' was actually litigated and resolved in the prior litigation.  The Arizona court reached its decision under Arizona law while we are asked to decide this case under California law.").

California's refusal to apply collateral estoppel to cases arising under different sources of law is in line with the prevailing rule in most jurisdictions, including the Ninth Circuit.  See, e.g., Peterson v. Clark Leasing Corp., 451 F.2d 1291, 1292 (9th Cir. 1971) (per curiam) ("Issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same."); Cincinnati Ins. Co. v. Beazer Homes Invs., LLC, 594 F.3d 441, 445 (6th Cir.) (collecting cases for the proposition that "[c]ollateral estoppel does not bar the relitigation of issues where the legal rules governing a specific case or issue are different"), vac. on other grounds 399 F. App'x 49, 50 (6th Cir. 2010); Boomer v. AT&T Corp., 309 F.3d 404, 422 n.10 (7th Cir. 2002) (declining to give preclusive effect to California case because in that case, "the question of unconscionability involved California law, where in this case it involves Illinois law, and therefore the issues are not the same"); Guild Tr. v. Union Pac. Land Res. Corp., 682 F.2d 208, 211 (10th Cir. 1982) (denying the application of collateral estoppel, in part, because the law applied in the prior case was Colorado property law and the law governing the case before the court was Wyoming property law); Evanston Ins. Co. v. Affiliated FM Ins. Co., 556 F. Supp. 135, 137 (D. Conn. 1983) (no collateral estoppel in case involving interpretation of identical insurance policies because prior case was decided under Pennsylvania law, while second case was governed by Connecticut law).

It is true, as Pulte points out, that in applying the doctrine of res judicata (also known as claim preclusion), courts have held that "judgment under the law of one state precludes an action in the other."  18 Charles A. Wright & Arthur R. Miller, et al., Federal Practice

& Procedure § 4411 n.17 (3d ed. 2017 update) (collecting cases).  However, this rule has been applied to prevent plaintiffs from escaping "the res judicata effect of a negative decision under the law of one state by filing a second suit based on the same facts in another state"—a scenario not at issue in this suit.  See, e.g., Davis Wright & Jones v. Nat'l Union Fire Ins. Co. of Pittsburgh, 709 F. Supp. 196, 199 (W.D. Wash. 1989), aff'd 897 F.2d 1021 (9th Cir. 1990).  And importantly, Pulte cites no California authority applying this rule in the context of issue, rather than claim, preclusion.

Accordingly, the Court concludes that California courts would not hold that this case raises the same issues decided in Pulte I.  Because there is no identity of issues, the Court declines to give Pulte I preclusive effect.

## B.  Ongoing Operations Limitations

The AIEs in each of ASIC's GCL policies with Pulte's subcontractors contain language extending coverage to Pulte, but "only" as to "ongoing" operations performed by the subcontractors for Pulte "on or after the effective date of" the AIEs.  (See Doc. No. 42-2, CCI Policy Dated 10/20/2004, PageID 4400; Doc. No. 42-3, Foshay Policy Dated 7/3/2003, PageID 4471; Doc. No. 42-4, Foshay Policy Dated 7/3/2004, PageID 4531; Doc. No. 42-5, MJW Policy Dated 1/22/2006, PageID 4599; Doc. No. 42-6, MJW Policy Dated 1/22/2007, PageID 4665; Doc. No. 42-7, Tunstill Policy Dated 3/25/2006, PageID 4735; Doc. No. 42-8, Tunstill Policy Dated 3/25/2007, PageID 4800.)  TIG argues that these limitations affirmatively exclude coverage for the claims asserted in the Salazar and Morris lawsuits, which stem from liability that arose after all construction operations were completed.  (Doc. No. 42-27 at 11–17.)  Pulte argues that the policies affirmatively grant coverage for the claims asserted in Salazar and Morris, and that at the very least, the ongoing operations exclusions are ambiguous enough that ASIC should have tendered a defense.  (Doc. No. 50 at 15–19.)

As explained below, the Court agrees with TIG that the policies provided Pulte coverage only for liabilities that arose while Pulte's subcontractors' construction operations were in process.  Because the Salazar and Morris actions assert claims for

liabilities that arose years after construction was completed, ASIC owed no duty to defend Pulte in those suits.

### 1.    Law Governing the Duty to Defend.

The Court previously determined that Georgia law governs the construction of ASIC's GCL policies. Pulte II, 268 F. Supp. 3d at 1099. The Ninth Circuit has explained that:

> "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." Gee v. Tenneco, Inc., 615 F.2d 857, 861 (9th Cir. 1980); accord U.S. Fidelity and Guaranty Co. v. Lee Investments LLC, 641 F.3d 1126, 1133 (9th Cir. 2011) ("Perhaps a better way of putting it is to say that one of the goals in deciding state law questions is to do no harm to state jurisprudence."). "[F]ederal courts are bound by the pronouncements of the state's highest court on applicable state law." Ticknor v. Choice Hotels, Inc., 265 F.3d 931, 939 (9th Cir. 2001). Similarly, a federal court is "not free to reject a state judicial rule of law merely because it has not received the sanction of the state's highest court, but it must ascertain from all available data what the state law is and apply it." Estrella v. Brandt, 682 F.2d 814, 817 (9th Cir. 1982). "An intermediate state appellate court decision is a 'datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" Id. at 817 (quoting West v. A.T.&T. Co., 311 U.S. 223, 237 (1940)); see also Lewis v. Tel. Empl. Credit Union, 87 F.3d 1537, 1546 (9th Cir. 1996) (citing In re Kirkland, 915 F.2d 1236, 1239 (9th Cir. 1990) to recognize that ". . . where there is no convincing evidence that the state supreme court would decide differently, 'a federal court is obligated to follow the decisions of the state's intermediate appellate courts'").

Kwan v. SanMedica Int'l, 854 F.3d 1088, 1093 (9th Cir. 2017).

Under Georgia law, "in construing the terms of an insurance policy," the Court must "look first to the text of the policy itself." Ga. Farm Bureau Mut. Ins. Co. v. Smith, 784 S.E.2d 422, 424 (Ga. 2016). "Words in the policy are given their 'usual and common' meaning, see OCGA § 13–2–2(2), and the policy 'should be read as a layman would read it and not as it might be analyzed by an insurance expert or attorney.'" Id. (quoting State Farm Mut. Auto. Ins. Co. v. Staton, 685 S.E.2d 263, 265 (Ga. 2009)). "Where the contractual language is explicit and unambiguous, 'the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured.'" Id. (quoting Reed v. Auto–Owners Ins. Co., 667 S.E.2d 90, 92 (Ga. 2008)). "This is so because Georgia law permits an insurance company to 'fix the terms of its

policies as it sees fit, so long as they are not contrary to the law,' thus companies are free to 'insure against certain risks while excluding others.'" Id. (quoting Payne v. Twiggs Cty. Sch. Dist., 496 S.E.2d 690, 691 (Ga. 1998)).

In Georgia, as in most states, an insurer's duty to defend is quite broad. In ascertaining "whether an insurer has a duty to defend[,]" the Court must compare "the language of the policy . . . with the allegations of the complaint" asserted against the insured. Hoover v. Maxum Indem. Co., 730 S.E.2d 413, 418 (Ga. 2012). "If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." Id. (quoting BBL-McCarthy, LLC v. Baldwin Paving Co., 646 S.E.2d 682, 685 (Ga. Ct. App. 2007)). This maxim holds even if "the allegations of the complaint against the insured are ambiguous or incomplete with respect to the issue of insurance coverage." Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc., 490 S.E.2d 374, 376 (Ga. 1997). However, the duty to defend will not arise if the facts alleged in the complaint "unambiguously exclude coverage under the policy[.]" Id. (citation and internal quotation marks omitted).

2.    Construing the Ongoing Operations Limitations.

The Court must first decide whether the AIEs in ASIC's insurance policies affirmatively restrict Pulte's coverage only to liabilities arising out of the subcontractors' active construction operations, as TIG contends, or whether the policies arguably apply to liabilities stemming from completed operations, as Pulte contends. In doing so, the Court must generally construe the policies' words in accordance with their "usual and common signification." Ga. Code Ann. § 13-2-2(2). Under Georgia law, the "usual and common meaning of a word 'may be supplied by common dictionaries.'" Auto-Owners Ins. Co. v. Parks, 629 S.E.2d 118, 121 (Ga. Ct. App. 2006) (quoting Lemieux v. Blue Cross & Blue Shield of Ga., 453 S.E.2d 749, 751 (1995)). However, "technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning." Ga. Code Ann. § 13-2-2(2).

The AIEs at issue in this case contain similar, but not identical language. The AIE

for the CCI policies states that:

> WHO IS AN INSURED (SECTION II) is amended to include as an insured [Pulte], **but only with respect to liability arising out of "your work"**[5] **which is ongoing** and which is performed by [CCI] for [Pulte] on or after the effective date of this Endorsement.

(Doc. No. 42-2 at PageID 4400 (emphasis added).)   The AIEs in the Foshay policies provide that:

> WHO IS AN INSURED (SECTION II) is amended to include as an insured [Pulte], but only with respect to liability arising out of "your work" which is performed at the project designated above. **This Endorsement applies only to ongoing operations performed by [Foshay]** on or after the effective date of this Endorsement.

(See, e.g., Doc. No. 42-3 at PageID 4471 (emphasis added).)   Finally, the AIEs for the MJW and Tunstill policies provide that:

> WHO IS AN INSURED (SECTION II) is amended to include as an insured [Pulte], **but** only with respect to liability arising out of "your work" and **only as respects ongoing operations performed by [MJW or Tunstill]** for [Pulte] on or after the effective date of this Endorsement.

(See, e.g., Doc. No. 42-5 at PageID 4599 (emphasis added).)   The parties do not suggest that the minor wording differences between the AIEs are significant, and thus the Court gives the AIEs a common construction.

Each of the AIEs amend the subcontractor policies to include Pulte as an additional insured, but "only" as to "ongoing" operations performed by the subcontractors for Pulte

---

[5]    The policies each define "your work" as:

   a.   Work or operations performed by you or on your behalf; and
   b.   Materials, parts or equipment furnished in connection with such work or operations.
"Your work" includes:
   a.   Warranties or representations made at any time with respect to the fitness, quality, durability, performance, or use of "your work"; and
   b.   The providing of or failure to provide warnings or instructions.

(See, e.g., Doc. No. 42-2 at PageID 4385.)

on or after the effective date of the AIEs. Giving these words their "usual and common signification," Ga. Code Ann. § 13-2-2(2), the Court concludes that the AIEs extend insurance to Pulte only for potential liabilities that arose while construction was in process, and not for liabilities that manifested after the subcontractors' operations were complete.

In this context, the word "only" is a term of limitation, which means "with the qualification or restriction that." Webster's Third New International Dictionary 1577 (1981). "Ongoing" in the AIEs is used as an adjective modifying either "your work" or operations, and means "that is actually in process." Id. at 1576. "Operation" is a noun that means "a doing or performing [especially] of action." Id. at 1581. Thus, when the AIEs grant insurance coverage to Pulte, "but only . . . as respects ongoing operations performed by [the subcontractors]," the AIEs in effect state that Pulte's coverage is subject to the qualification that it extends only to subcontractor undertakings that are actually in process. See Weitz Co., LLC v. Mid-Century Ins. Co., 181 P.3d 309, 315 (Colo. Ct. App. 2007) (holding "that under the plain and ordinary meaning" of the term "ongoing operations" in an AIE, "the endorsement . . . does not cover 'completed operations'").

The Court's understanding is buttressed by how the term "ongoing operations" is understood in the insurance industry. See Ga. Code Ann. § 13-2-2(2) ("[W]ords used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning."). One commentator, in tracing the historical development of ongoing operations language in standard construction-industry GCL policies, notes that such clauses were specifically developed to contract around judicial decisions extending coverage for liabilities that arose after construction operations were complete. See Weitz, 181 P.3d at 314 ("Without express language limiting coverage to 'ongoing operations,' additional insured endorsements have been interpreted to apply to completed operations losses." (quoting 4 Phillip. L. Brunner & Patrick J. O'Connor, Jr., Construction Law § 11:56)). Another commentator has similarly noted that:

> The difference between "your work" and "your ongoing operations" is that "your work," within the parameters of the [GCL] definition, can be either

work in progress or work that has been completed; "ongoing operations" is not a defined [commercial general liability] term, **but suggests work only for as long as it is actually being performed**. In short, coverage for the additional insured with respect to the named insured's completed operations was clearly present in the original edition of CG 20 10. The insurance industry sought to remove that component of coverage by insuring only liability arising out of the named insured's **ongoing operations—or work in progress**— beginning with the 1993 version of the endorsement.

D. Malecki, P. Ligeros & J. Gibson, The Additional Insured Book 184 (5th ed. 2004) (emphasis added). A third commentator concurs, noting that "post-1993 editions of [standard AIEs] narrow the scope of an additional insured's coverage by limiting its application to liability arising out of the insured contractor's 'ongoing operations,' the [implication] of which is that additional insureds are not covered with respect to liability in connection with completed projects." Weitz, 181 P.3d at 314 (quoting R. Carris et al., Construction Risk Management ch. VI (IRMI 2004)). Thus, as the Tenth Circuit has noted, it appears that "the words 'only' and 'ongoing operations' used in conjunction result in more limited coverage for the additional insured general contractor vis-à-vis the insured subcontractor." United Fire & Cas. Co. v. Boulder Plaza Residential, LLC, 633 F.3d 951, 958–59 (10th Cir. 2011).

The Court's construction is also in line with numerous state and federal cases interpreting ongoing operations limitations. See Carl E. Woodward, L.L.C. v. Acceptance Indem. Ins. Co., 743 F.3d 91, 99 (5th Cir. 2014) (holding that when an AIE contains an ongoing operations limitation, "claims for liability can be brought after ongoing operations are complete, but the underlying liability cannot be due to the 'completed operations'"); United Fire, 633 F.3d at 959 ("Coverage for 'ongoing operations' is distinct from coverage for 'completed operations' or 'completed work.'"); Noble v. Wellington Assocs., Inc., 145 So.3d 714, 720 (Miss. Ct. App. 2013) (holding that it was "clear" from ongoing operations limitation that the general contractor was only "protected against lawsuits arising from accidents occurring during the time [the subcontractor] performed dirt work"); Weitz, 181 P.3d at 315. These cases have generally advanced three rationales for interpreting the

words "only" and "ongoing operations" as restricting coverage to claims arising from active construction activities: (i) this interpretation best comports with the plain meaning of those terms, see, e.g., Carl E. Woodward, 743 F.3d at 99; (ii) this interpretation is generally accepted in the insurance industry, see, e.g., Weitz, 181 P.3d at 314; and (iii) a contrary interpretation would convert standard GCL policies into performance bonds,[6] a separate (and generally more expensive) insurance product. See, e.g., Noble, 145 So.3d at 720 ("CGL policies are not meant to cover the business risk that the subcontractors' performance may be inadequate. Rather, the purpose of a CGL policy is to protect businesses from liability to third parties for bodily injury or property damage resulting from accidents." (citation omitted)). The Court finds all three of these rationales persuasive.

Pulte advances two arguments in opposition to the Court's construction. Neither are convincing. First, Pulte argues that the policies explicitly promised coverage for liabilities stemming from completed construction operations when they granted coverage for "liability arising out of 'your work,'" and defined "your work" as "work or operations performed" by Pulte's subcontractors. Pulte argues that the past tense of the word "performed" references to "work that was complete; i.e., completed operations." (Doc. No. 50 at 16–17.) Pulte asserts that, read against this context, the AIEs' limitation restricting coverage to work which was "ongoing . . . on or after the effective date of this Endorsement" operates "to exclude work completed prior to the policy inception, not as a completed operations exclusion." (Id. at 17.) However, Pulte's interpretation of the AIEs' restricting language renders the term "ongoing" essentially superfluous. See Noble, 145 So.3d at 719 ("[F]or 'ongoing operations' to have any meaning, it cannot encompass liability arising after the subcontractor's work was completed."). The AIEs already provide that coverage is restricted to liabilities arising "on or after the effective date of this

---

[6]      A "performance bond" is "a surety bond guaranteeing faithful performance of a contract." Webster's Third New International Dictionary 1678 (1981). In the construction context, a performance bond "guarantees the contractor will satisfactorily perform the contract." United Fire, 633 F.3d at 959.

Endorsement," and it is thus implausible to read the reference to "ongoing operations" as merely restricting coverage to work completed prior to the policies' inception.

Second, Pulte argues that because ASIC drafted the AIEs, and the AIEs do not define "ongoing operations," the AIEs should be construed strictly against TIG. (Doc. No. 50 at 17.) Relatedly, Pulte argues that the AIEs are at least ambiguous as to whether they provide completed operations coverage, and therefore ASIC had a duty to defend Pulte in the Salazar and Morris lawsuits, while reserving the right to litigate its coverage defenses later. (Id. at 19.) See also Hoover, 730 S.E.2d at 416. But as the Court has already explained, the "ongoing operations" language is unambiguous when those words are given their usual and common meaning as Georgia law requires. The fact that ASIC could have drafted its ongoing operations exclusions more clearly does not automatically mean that the language it did choose is unclear. And because the "ongoing operations" language is unambiguous, ASIC was permitted to rely upon it as a coverage defense without first incurring the costs of representing Pulte in the Morris and Salazar actions.

Moreover, the Court is not persuaded by Pulte's broader insistence that it was unfairly surprised by ASIC's refusal to provide completed operations coverage. As a large corporation, Pulte is a sophisticated, high-volume consumer of commercial insurance products. (Doc. No. 49-15, Pulte Form 10-K, PageID 5626, 5655.) Pulte's Federal Rule of Civil Procedure 30(b)(6) deponent, Jean Marusak, testified that she "understood that [subcontractors in] California had a hard time getting full, completed operations coverage, [and] so [Pulte was] asking for ongoing [operations coverage], as a minimum," during the policy periods relevant to this lawsuit. (Doc. No. 42-23, Marusak Dep'n, PageID 5287–88.) This testimony is binding on Pulte, see, e.g., Kelly Servs., Inc. v. Creative Harbor, LLC, 846 F.3d 857, 867 (6th Cir. 2017), and strongly suggests that Pulte not only knew the difference between ongoing and completed operations coverage, but understood that its subcontractors would likely only be able to obtain ongoing operations coverage. It would be illogical for the Court to contort the language of the policies Pulte's subcontractors did buy to provide coverage that they did not pay for and could not acquire

in the marketplace.

Finally, the Court notes that the California Court of Appeal's contrary conclusion in Pulte I that the "ongoing operations" language in similar policies did not clearly exclude coverage for completed operations is distinguishable. Pulte I relied on California precedent that essentially imposed a clear statement rule on insurers drafting ongoing operations limitations, and found that the language at issue was not clear enough to satisfy California law. See 14 Cal. App. 5th at 1114–16 (citing Pardee Constr. Co. v. Ins. Co. of the W., 77 Cal. App. 4th 1340, 1356–57 (2000)). By contrast, Georgia law is more neutral, and permits an insurer to "fix the terms of its policies as it sees fit" in order to "insure against certain risks while excluding others." Payne, 496 S.E.2d at 691. Thus, where "the contractual language is explicit and unambiguous," as is the case here, "'the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured.'" Ga. Farm Bureau, 784 S.E.2d at 424 (quoting Reed, 667 S.E.2d at 92).

Accordingly, the Court concludes that the language in the subcontractor AIEs unambiguously limits Pulte's coverage to liabilities that arose while construction was in process, and not for liabilities that manifested after the subcontractors' operations were complete. While the AIEs permit Pulte to bring "claims for liability . . . after ongoing operations are complete, . . . the underlying liability cannot be due to the 'completed operations.'" Carl E. Woodward, 743 F.3d at 99.

### 3. Application to the *Salazar* and *Morris* Complaints.

Having interpreted the AIEs' limitations, the Court must next determine whether the Salazar and Morris actions asserted liabilities that arguably stemmed from the subcontractors' ongoing operations. Id. at 98 ("We now compare the complaint and the policy in order to analyze whether a duty to defend arose."); Ga. Farm Bureau, 784 S.E.2d at 424. Liabilities arising from ongoing operations include "accidents occurring during the time [the subcontractor] perform[s] [its] work," such as a subcontractor "accidentally knock[ing] over a neighbor's tree with a bulldozer or cut[ing] a gas line while performing

dirt work[.]"  <u>Noble</u>, 145 So.3d at 721.  By contrast, "[c]ourts have held, quite logically, that liability for construction defects arises out of a subcontractor's completed operations."  <u>Carl E. Woodward</u>, 743 F.3d at 101 (collecting cases and holding "that liability for construction defects, while created during ongoing operations, legally arises from completed operations").

TIG argues that the <u>Salazar</u> and <u>Morris</u> complaints solely asserted liability for construction defects, and therefore concerned completed operations claims.  (Doc. No. 42-27 at 17–21.)  The Court agrees.  <u>Salazar</u> was "an action to recover the cost to repair personal and property damage and <u>construction defects</u> at homes owned by" the plaintiffs, (<u>see</u> Doc. No. 1-6 at ¶ 3 (emphasis added)), and the gravamen of the plaintiffs' allegations was that "<u>since the completion of the structures</u> on the subject Real Property, the residential improvements have become known to be defective . . .  in that they [were] not adequately constructed to prevent water intrusion."  (<u>Id.</u> at ¶ 39.)  Similarly, the <u>Morris</u> action alleged that Pulte and its subcontractors "breached . . . contracts" with residential real estate purchasers "by delivering to Plaintiffs . . . homes and residential lots . . . which were not built in a reasonably workmanlike manner, were not of merchantable quality and were not built in conformance with building codes, local ordinances, and/or plans and specifications."  (Doc. No. 1-7 at ¶ 24.)

These are classic completed operations claims.  For example, in <u>Carl. E. Woodward</u>, the Fifth Circuit held that an insurer had no duty to defend a general contractor from a lawsuit alleging that a subcontractor delivered substandard concrete foundation work, where the relevant insurance policy contained an ongoing operations limitation, because the general contractor's liability "did not arise out of the [subcontractor's] ongoing operations."  743 F.3d at 101–102.  Similarly, in <u>Absher Construction Co. v. North Pacific Insurance Co.</u>, the court concluded that an insurer had no duty to defend a lawsuit alleging that the contractor delivered a defective hydronic heating system, where the relevant policy contained an ongoing operations limitation, because the lawsuit alleged that the heating systems only began to fail after the project's completion.  861 F. Supp. 2d 1236, 1247

(W.D. Wash. 2012).  See also United Fire, 633 F.3d at 959 (no duty to defend under policy containing ongoing operations limitation where underlying complaint alleged that floor boards began warping after construction was complete); Noble, 145 So.3d at 720 (no duty to defend under policy containing ongoing operations limitation where underlying complaint alleged that foundation began cracking after construction was complete); Weitz, 181 P.3d at 315 (no duty to defend under policy containing ongoing operations limitation where underlying complaint alleged water intrusion resulting from construction defects that manifested after property owner took possession of the completed project).

Accordingly, the Court concludes that because Pulte had no coverage for completed operations claims, and the Salazar and Morris actions only raised completed operations claims, ASIC had no duty to defend Pulte in either action.  Because Pulte's six causes of action are each premised on ASIC's alleged violation of its duty to defend, TIG is entitled to judgment as a matter of law on all of Pulte's claims.[7]

///
///
///
///
///
///
///
///
///
///
///
///

---

[7]    Pulte's various evidentiary objections, (see Doc. Nos. 50-1, 53-1), are sustained where valid, and otherwise overruled.

## **Conclusion**

For the foregoing reasons, the Court concludes that: (i) the California Court of Appeal's decision in <u>Pulte I</u> does not have collateral estoppel effect on the issues raised in this suit; (ii) the ongoing operations limitations in ASIC's AIEs unambiguously restricted Pulte's coverage to liabilities that arose during construction operations; and (iii) ASIC had no duty to defend Pulte in the <u>Salazar</u> and <u>Morris</u> actions, because those suits only pressed claims that arose long after the subcontractors' ongoing operations had ceased.  The Court accordingly denies Pulte's motions for partial summary judgment, grants TIG's cross-motion for summary judgment, and directs the Clerk of the Court to enter judgment in favor of TIG.

**IT IS SO ORDERED.**

DATED: May 16, 2018

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

3:16-cv-02567-H-AGS